UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:14-CV-00169


MARIO LUIS GONZALEZ PLIEGO,                                          Petitioner

v.

AMANDA LEIGH HAYES,                                                 Respondent


## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

This is a Petition for Return of Child pursuant to 42 U.S.C. § 11601, *et seq*., the International Child Abduction Remedies Act, which implements the Hague Convention on the Civil Aspects of International Child Abduction. This Court has original jurisdiction under 42 U.S.C. § 11603(a).

The Court held an evidentiary hearing on December 18 and 19, 2014. The Court now issues the following written Findings of Fact and Conclusions of Law in support of its resolution of this matter.

## FINDINGS OF FACT[1]

### 1. Timeline

Amanda Leigh Hayes and Mario Luis Gonzalez Pliego are the parents of a minor child who is the subject of this litigation.[2]  Hayes grew up in Christian County, Kentucky and is a

---

[1] In writing these factual findings, the Court relied on the evidentiary hearing testimony of Mario Luis Gonzalez Pliego, Amanda Leigh Hayes, Judy Hall, Frieda Utley, Duncan Campbell, M.D., LeTonia A. Jones, Mercedes Pliego Viyuela, Ulusahin H. Namdar, M.D., and Defne Dursunkaya, M.D..  Further, the Court relied on the deposition testimony of Yusof Bozkurt, Colonel Eduardo Luis Fernandez Martin, Maria Iceta Hernandez, Eray Karinca, John Higgins, M.D., and Guler Ann Gerger.

[2] The Court will refer to the minor child as "the child" for privacy reasons.

citizen of the United States.  Pliego grew up in Barcelona, Spain and is a citizen of Spain.  In 2001, Hayes began graduate school at the University of Michigan in Ann Arbor, Michigan focusing in Near Eastern Studies.  As part of her studies, she traveled to Germany in the summer of 2001 to study German at the Goethe Institute.  While there, Hayes met Pliego.  The parties began dating, and continued their relationship after Hayes returned to the United States.  In 2005, Pliego became a Spanish diplomat, and in 2007, Hayes moved to Madrid, Spain, where the parties established a civil union.  Hayes worked at the Scandinavian School, teaching preschool and kindergarten.  The parties were formally married in 2009 in Barcelona, Spain, and were posted in Indonesia beginning August 1, 2009.[3]  Hayes worked at the Australian International School through December of 2010.

Hayes became pregnant in 2010.[4]  The parties agreed that Hayes would have the child in Kentucky to receive better medical care and be with her extended family.  The child was born on March 4, 2011 in Kentucky; both parties were present for the birth.  The parties applied for a Spanish passport and a Spanish diplomatic passport for the child, both of which were granted. The child is a dual citizen of the United States and of Spain.  When the child was four weeks old and cleared to fly, Hayes and the child returned to Indonesia, where they lived until the family was posted in Ankara, Turkey.

While in Turkey, the child attended "Yapa"; Pliego characterized Yapa as a school, while Hayes testified that it was a recreational center where mothers and children paint, socialize, and

---

[3] The parties continued to pay taxes in Spain, pursuant to a Spanish law that states Spanish diplomats and their families are fiscal residents of Spain.

[4] Pliego made much of the fact that Hayes was diagnosed with bipolar disorder at age 19 and took medication for this disorder.  Hayes did wean off her medication during pregnancy and for six months of breast-feeding, under the supervision and advice of her doctor.  Pliego claimed that after Hayes went off her medication, she was irritable and anxious, thought someone was trying to enter the house, once tried to cut the side of her wrist, and once tried to jump off the balcony, an event that the Court will discuss at length later in this Opinion.  Generally, the Court finds that the evidence suggests that Hayes's bipolar disorder was effectively managed with medication.

play with toys.  Hayes stated that she and the child usually attended Yapa one or two hours a week.  The family spoke English and Spanish at the home, and the child picked up "a few words and phrases" in Turkish.  The child later attended Ankara English Preschool, which teaches in both English and Turkish.  The child attended the preschool three to five mornings per week. The child frequently played in the park across the street from the parties' home, and attended playgroups as well as weekly services at the Anglican Church.  All of the child's belongings were in his room in Turkey.

Both parties submitted travel logs to illustrate where the child has lived over the course of his life.[5]  The child is currently 44 months old.  The child was in Kentucky for the first month of his life, before returning to Indonesia in April of 2011.  The child was in Indonesia for four months, spending most of August of 2011 in Spain on vacation.  The child returned to Indonesia and remained there until June of 2012, with the exception of vacations to Australia, New Zealand, Bali, Laos, Thailand, and Singapore.[6]  Aside from vacations, the child lived in Indonesia for 15 months (excluding the one-month vacation to Spain, the child was in Indonesia for 14 months).  In July of 2012, the child moved to Turkey.  The child spent most of September of 2012 and May of 2013 on trips to Kentucky.  With the additional exception of two week-long trips to Spain, the child was in Turkey for 21 months (excluding the two trips to Kentucky, the child was in Turkey for 19 months).

Hayes and Pliego agreed that Hayes and the child would travel to Kentucky to visit Hayes's family in April of 2014.  Hayes and the child normally travel to Kentucky at least once per year, often accompanied by Pliego.  Hayes and the child left Turkey on April 6, 2014, and

---

[5] Hayes disputes the accuracy of Pliego's calendar, while Pliego accepts Hayes's log as accurate.  The Court has examined the evidence presented by both parties to create this timeline.

[6] The length of these vacations ranged from 2 days to 13 days.  Some trips included visits to more than one of the listed countries.

planned to return on May 4, 2014.   Pliego registered a letter with the Spanish Embassy authorizing his family's trip to the United States, informing the Embassy that they would return at the "end of April 2014/beginning of the month of May 2014."[7]   On April 26, 2014, after Hayes arrived in Kentucky, she told Pliego that she would not be returning and intended to keep the child with her in Kentucky.   Hayes concedes that Pliego did not consent to the child remaining in Kentucky.[8]   Hayes filed for divorce, custody, and for an emergency restraining order in Christian County, Kentucky, while Pliego has filed for divorce and custody in Spain.

**2.  Alleged abuse of the child**

The parties paint vastly different pictures of their marriage and of each other's parenting. Hayes testified that Pliego was abusive both to her and to the child, while Pliego denied the majority of such allegations.  The Court will attempt to summarize both parties' contentions.

In his testimony, Pliego denied being abusive towards the child.  Pliego's mother, M. Mercedes Pliego Viyuela, testified that Pliego was a good father to the child, and that he was not abusive.  Viyuela stated that Pliego would sing songs with the child, play with balloons and toys, and read stories.   Viyuela testified that she never saw Pliego inappropriately disciplining or neglecting the child.

Hayes testified differently regarding Pliego's parenting and events that occurred between Pliego and the child.  Hayes testified that when the child was an infant, Pliego did not help out with the child during the night.  She did testify that she asked Pliego to attend to the child one night around June of 2011 in Indonesia.  Hayes stated that she woke up because Pliego was

---

[7] Hayes testified that this was the first time Pliego had registered such a letter, suggesting that he had, in some way, predicted that Hayes would not return to Turkey.  Pliego testified that the international atmosphere was changing, and that embassies were more aware of international kidnapping. Pliego testified that this was the reason he thought it would be a good idea to write the letter at that time.

[8] Further, Pliego testified that the child was to begin his next year of schooling at the French school in Ankara, and that he had already paid the tuition in advance.

4

screaming "shut up, shut your mouth!" at the child; she went to the child's room and saw Pliego holding the child under the child's arms, shouting at him.  Hayes testified that she was scared that Pliego was going to shake the child, and that she took the child and did not ask Pliego again to help during the night.

Hayes testified that she was unhappy with the housekeeper, Sutarti, that Pliego hired in Indonesia and brought to Turkey against Hayes's wishes.  Hayes stated that Sutarti did not use toilet paper and wiped her feces with her hand.  Hayes testified that Sutarti also kept her room in a very dirty condition and that Hayes was concerned about her hygiene.  According to Hayes, Sutarti interfered with Hayes's discipline of the child by removing him from time-outs.  Hayes testified that she did not like Sutarti being around the child.

Hayes testified that Pliego used inappropriate methods of discipline after the child grew older and the parties moved to Turkey.  She said that Pliego would grab the child by the back of the head and once picked him up by the back of the neck.  Hayes testified that Pliego would insult the child and yell at him to toughen up, to shut up, and to stop whining when the child hurt himself and cried.  Hayes testified that for a period of time, Pliego would "force-feed" the child – she alleged that Pliego would continue to feed the child, after he had indicated that he was full, by continuing to put food in the child's mouth and pushing it down toward his throat.  At times, Pliego would pinch the child's nose, push the spoon in the back of his mouth, and hold his mouth closed.  When the child started crying, Pliego would wait for him to gasp for air, then would put more food in his mouth, before holding his mouth closed again.  Hayes alleges that the child vomited three times after this behavior.  Viyuela testified that she was present for one of the times when the child vomited.  She stated that Pliego did not force-feed the child, but rather that

the child vomited as a result of being sick, having a respiratory infection, and having swallowed too much mucus.

Hayes described finding various bruises on the child's body, including on the sides of his abdomen, on the backs of his thighs, and once on the back of his neck.  She stated that Pliego admitted to her that the bruises were from pinching the child and from grabbing the back of his neck.  In his testimony, Pliego denied bruising the child.

Hayes testified as to several incidents that she said made her fearful for the child's safety when he was around Pliego.  First, during January in Istanbul, Turkey, the child was having a tantrum at breakfast and Pliego took him upstairs.  At the time, the parties lived in an apartment with a three-story staircase; Hayes admitted into evidence photographs illustrating that the railing had a gap at the top of the landing that was big enough for a child to fall through.  Hayes testified that Pliego left the child kicking and screaming at the top of the stairs near the space in the railing.  When Hayes went to try and get the child, Pliego held her back by the shoulders, telling her that it was fine and that she was crazy.

Hayes described an incident that occurred when Hayes and her mother were painting the parties' apartment in Turkey.  Hayes's mother, Judy Hall, corroborated the incident.  Hall testified that she and Hayes were in the top floor of the apartment in Turkey, while Pliego and the child were across the street at the park.  They had the balcony door open because they were painting, and they heard the child screaming through the door.  They looked across the street and saw the child standing alone in the park.  They searched for Pliego, and found him standing far away, walking away from the child.  They were concerned, because Pliego had told them that wild dogs roamed in that park.  Pliego testified that the child was used to being carried and that the child was just upset because Pliego asked him to walk instead.  Pliego stated that the park

was closed, and that the child was not at risk.  Pliego also testified that he was not far from the child; the parties disputed the distance.

Both Hayes and Hall described another incident where Hall, Hayes, Pliego, and the child were sightseeing in Turkey.  Hayes and Hall went into a shop to purchase pottery, while Pliego and the child were in the car, which Hayes alleges was parked in a high-traffic area.  Hall testified that Pliego left the child in the car to enter the store and see "what was taking so long" before "screaming at [Hayes] to return the vase" that she had purchased.  Pliego testified that it was not a high traffic area, and that the child was not in danger.

After Hayes decided to remain in Kentucky with the child in 2014, this Court issued an Order mandating Skype visitation between Pliego and the child.  Hayes stated that during some of those Skype sessions with the child, Pliego would pull up his shirt.  She introduced into evidence several screenshots showing Pliego topless or pulling up his shirt during Skype video sessions.  Pliego testified that he lifted his shirt up to get his son's attention when he lost interest. He said he does a "gorilla dance" and plays on his stomach like drums.  Hayes testified, and Pliego conceded, that Pliego would ask the child to show Pliego his "dirty little butt" or talk about "poop and fart."  Pliego said that in Spain, it is more common and acceptable to discuss "scatological" issues.  Finally, Hayes testified that Pliego would pinch and rub his nipples in front of the child and said that he was trying to "teach him to one day experience the pleasure that he does."  She also claimed that Pliego grabbed the child by the testicles.  Pliego denied pinching his nipples or grabbing the child's testicles.

Pliego produced an exhibit with approximately 1,100 photographs of the family, and presented many photographs of Pliego and the child at varying ages and at varying locations.  In these photographs, Pliego and the child are both smiling and appear happy.  Hayes testified that

Pliego was very conscious of his image, and staged many of the photographs, though she did not know how many.

### 3.   Alleged domestic violence

In addition to the alleged child abuse, which the Court will discuss below, Hayes painted a picture of a controlling relationship where Pliego had the power and controlled the finances. Pliego testified, however, that Hayes had equal access to the parties' money, and that she had a Spanish bank account where she deposited her salary from teaching.  He testified that he gave her his salary of approximately $6,000 per month to manage the household.  He alleged that Hayes kept the accounts, paid the maid, and kept an Excel spreadsheet managing their finances. Hayes agreed that she had access to a lockbox in the home where the parties kept their valuables, and testified that she also had a bank account in Spain.[9]

Hayes testified that the abuse began when the parties were living in Spain.  During a trip to Barcelona, she testified that Pliego was concerned about pickpockets and "thought [Hayes] wasn't listening [to him] closely enough" so he squeezed her hand so hard that he bruised it. Hayes testified that after the parties moved to Indonesia, Pliego began pinching her on her upper arm so hard that it bruised whenever he "thought she wasn't listening"; she also stated that he would grab her face and say "look at me when I'm talking to you."

Hayes testified that the abuse intensified during her pregnancy, which began in approximately in June of 2010.  According to Hayes, the parties got into verbal arguments, and Pliego would scream and curse at her.  Hayes testified that Pliego did not want to touch her stomach, told her that it was "gross and disgusting," referred to her child as "it," and stated that "if it weren't for that thing growing in your belly, I would throw you out in the street."

---

[9] Hayes also testified that the money in that account is now exhausted due to living expenses and legal fees.  At this point, she has student debt, no assets, and  is dependent on her family until she resumes work.

Both parties discussed an incident that occurred in Indonesia in approximately September of 2011, while Hayes was six-months pregnant.  According to Hayes's testimony, Pliego became angry at her during lunch, and he ran around the table, grabbed her arm, and started yelling.  She ran into the bedroom, locking the door.  Pliego screamed and pounded at the door, yelling at her to "open the door you fucking bitch."  Hayes told Pliego that she would open the door if he would calm down.  After several minutes, Pliego told Hayes that he had calmed down, and so she opened the door.  Pliego slammed it open and approached Hayes, and she backed away with her hands up.  Hayes testified that she was frightened and that she said to Pliego, "if you don't get away from me, I'm going to jump off the balcony."  Pliego then left, but returned soon, roughly grabbed her shoulder, leaving bruises, and told Hayes that if she said that again, he would "punch her in the face."  Hayes stated that she did not intend to actually jump, that the door to the balcony was closed, and that she could not climb over the railing, especially not in her advanced state of pregnancy.  Pliego described the event differently, testifying that he believed Hayes intended to jump off of the balcony and grabbed her to prevent her from jumping.

Hayes testified that after the child was born, Pliego continued to push and verbally abuse her.  Hayes testified about two incidents where Pliego pushed her in the foyer of the Indonesian apartment while she was holding the child; the second time, she fell after being pushed.  Hayes testified that the majority of the abuse occurred in front of the child.  Further, Hayes testified that Pliego took her and the child's passports out of the house and said that he would "throw her out in the street like the dog you are" and "if you ever mention leaving me with [the child] again, I'll kill you in your sleep."

9

Hayes described an incident where Pliego dropped her and the child off at home.  She put the child down for a nap, then started watching a movie wearing headphones.  During this time, Pliego realized that he was locked out of the apartment.  Pliego knocked on the door and called Hayes repeatedly, but she did not hear him or the phone ringing.  Pliego ended up calling a locksmith to let him in, then went upstairs and grabbed Hayes by the shoulders, yelling.  Hayes testified that Pliego's "rage" lasted for two hours, and that he said she "shouldn't be scared, she should be terrified" and that "he was only showing 5% of what he was feeling."  Hayes testified that Pliego said that he was going to take a rope and tie her phone around her neck "like a dog."  Hayes stated that she texted her aunt, Frieda Utley, and told her that "things were bad" and that she was scared.  Utley testified that Hayes told her over Skype and text messages about several instances of abuse, and corroborated that Hayes texted her after the incident described above.

Hayes testified that Pliego's mother, a former doctor, came to Turkey to assist Pliego following outpatient surgery to remove a mole on his back.[10]  Hayes described Pliego's behavior after his mother left as very "morbid, dark, and creepy" and stated that Pliego started talking about death frequently, including discussing the child dying.  Hayes testified that Pliego described being sad about the child's upcoming birthday because it meant that the child was "one day closer to death."

Finally, Hayes testified that Pliego raped her multiple times.  She stated that the parties had sex when Pliego wanted to have sex, and that he described sex as a wife's duty.  Hayes testified that on three occasions in Turkey in 2013 and 2014, Pliego forced her to have anal sex against her will.  During the first alleged rape, Pliego claimed that he "slipped" but continued penetrating her anally without lubricant even after Hayes yelled for Pliego to stop.  Hayes

---

[10] Hayes made much of the fact that Pliego's mother helped him with bathing, slept in the same bed as him, and that Pliego cried profusely when his mother left.  The Court finds that this information is largely irrelevant.

testified that afterwards, she was bleeding and in pain.  The second alleged rape occurred when Hayes awoke from a deep sleep in her bedroom to someone anally penetrating her; she testified that she did not know who it was at first.  She began fighting and yelling for the person to get off of her, and realized it was Pliego.  Hayes testified that afterwards, she threw up and that she was bleeding much worse than the first time.  The third alleged rape occurred after the parties had gone on a date.  Hayes was unclothed on the bed, and Pliego turned her on her back and anally penetrated her even while she cried and said no.  Afterwards, Pliego would not let Hayes leave the bed.

In his testimony, Pliego vehemently denied having anal sex or any nonconsensual sex with Hayes, at any time.

### 4.  Evidence of the alleged abuse

Hayes submitted thirteen photographs of bruises into evidence, and testified that they were caused by Pliego.  In the photographs, the Court can see small, light bruises on the child's neck and legs, as well as on Hayes's forearm.  During cross examination, Hayes admitted to seeing a variety of doctors, psychiatrists, and physical therapists during her time in Spain, Indonesia, and Turkey.  None of the doctors testified as to seeing physical evidence of bruising on her person.  Further, Ulusahin H. Namdar, M.D. was the child's doctor in Turkey and saw the child seven times over approximately a year-long period.  Namdar he testified that he never saw bruises or evidence of harm on the child's body.

### a.  Father John Higgins

Hayes testified that she told her pastor, Father John Higgins, about the abuse.  Higgins testified via deposition.  He is a parish priest at The Church of St. Nicolas of Myra in Cankaya, Ankara.  He holds a Certificate of Qualification in Social Work from the University of Central

England and a Social Science Ph. D. from the University of Birmingham. Higgins worked as a guardian ad litem from 1981 to 1990 and 1991 to 2000 in England.  Higgins knew Hayes because she attended the church on a regular basis, taught Sunday school, and was a member of the Church Council.  They also met to discuss faith and other issues, approximately every three to four weeks.  Higgins testified that Hayes once showed him bruises on the top of her left shoulder, and appeared fearful.  Higgins testified that Hayes told him that Pliego caused the bruises, and that he would yell and fight with her.

b.  Guler Ann Gerger

Further, Hayes stated that she spoke to her psychologist about the abuse.  Guler Ann Gerger testified via deposition.  Gerger is a psychologist who counselled Hayes in Ankara, Turkey, and telephonically after Hayes returned to Kentucky. The two had at least 38 counselling sessions together, starting in January of 2013.  She also jointly counseled Pliego and Hayes. Pliego attended 14 sessions, starting in June 19, 2013, "for the purpose of addressing and remediating issues raised in [Hayes's] counseling regarding parent conflict and violence." Docket No. 15-1.

Previously, Petitioner Pliego filed a Motion in Limine to Exclude Ann Guler.  Docket No. 28; Docket No. 29.  He argued that he was Gerger's patient, and that he was covered by the psychotherapist-patient privilege.  The Court found that the privilege did apply to Pliego's statements made to Gerger during the course of his therapy sessions.  The Court held that it would consider Gerger's testimony as to statements made by Hayes, but not as to any statements made by Pliego.

Following the evidentiary hearing on December 18 and 19, 2014, Hayes moved for the Court to consider the statements that Pliego made to Gerger during therapy, arguing that he had

waived his privilege during the hearing by: 1) testifying in direct contradiction to statements he made to Gerger in therapy sessions, and 2) putting his mental health at issue by calling Defne Dursunkaya, M.D., his psychiatrist in Turkey, as a witness.  At the hearing, Dursunkaya testified that she prescribed Pliego medication for adjustment disorder with anxiety and depression.  Further, she testified that Pliego had no violent outbursts in their sessions and that in her expert opinion, he was not prone to violence and was not a violent person.

The United States Supreme Court recognizes a psychotherapist-patient privilege. *See Jaffee v. Redmond*, 518 U.S. 1, 9-10 (1996). Specifically, "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure . . . ." *See id*. at 15.  The Court noted that the privilege could be waived, but declined to establish the parameters of waiver.  *Id.*  The Sixth Circuit has noted that "the issue of waiver of the psychotherapist-patient privilege has rarely been litigated in this circuit" and that "the precise standard of review for that issue is unclear." *Simon v. Cook*, 261 Fed. Appx. 873, 878 (6th Cir. 2008); *see also Maday v. Public Libraries of Saginaw*, 480 F.3d 815, 821 (6th Cir.2007) (holding that placing emotional state in issue waived the privilege, but not stating the standard of review being employed).  The *Simon* court ultimately held that placing one's mental health at issue does constitute a waiver of the privilege.  *Id*. at 885.

"The majority rule is that 'where the plaintiff seeks 'garden variety' emotional damages . . . the [psychotherapist-patient] privilege remains intact and is not waived.'"  *Lamb v. Hazel*, 2103 WL 1411239 at *7 (W.D. Ky April 8, 2013). In contrast, non-garden variety claims that would constitute a waiver of the privilege include: a cause of action for intentional or negligence infliction of emotional distress, an allegation of a mental injury or disorder, a claim of severe emotional distress, or a plaintiff's offer of expert testimony to support a claim of emotional

distress.  *Ford v. American River Transp. Co*., 2012 WL 4049467, at *3 (W.D. Ky. Sept. 13, 2012).

Although the instant situation does not fit neatly in any of the aforementioned sets of facts, the Court finds that Pliego has waived his privilege by putting his mental health at issue. He denied bruising his wife or child during his testimony, and he called a psychiatrist to testify as to his mental health and propensity for violence.  Thus, the Court will consider statements made by both Hayes and Pliego in the course of their therapy sessions with Gerger.

Gerger testified that Hayes told her about bruising caused by Pliego, his abuse of her and of the child, and sexual violence in their relationship.  Additionally, Gerger testified that Pliego admitted to causing bruising to the child and on Hayes, calling Hayes names, and cursing at her. Further, Gerger stated that she heard Pliego raise his voice at Hayes in Gerger's presence.

        c.  <u>Reporting the abuse</u>

Hayes was extensively questioned on why she did not report her abuse to the authorities. Hayes testified that she did not report the violence or abuse because she was ashamed, and did not want people to know.  Hayes said that she believed the abuse was her fault until speaking with her psychiatrist in Turkey.  Further, Hayes testified that Pliego had told her that because he was a diplomat and she did not speak Turkish, authorities in Turkey would not help her.

LeTonia A. Jones testified for Hayes as an expert in domestic violence.  Jones received her Master of Social Work from the University of Kentucky in 2004.  She worked for the Kentucky Domestic Violence Association from 2004 to 2013.  She currently serves as an Adjunct Faculty member at the University of Kentucky College of Social Work, lecturing on substance abuse, family violence, and risk management, and as the owner/mitigation specialist of

Defense Based Advocacy Services, LLC.  Finally, she has served as a trainer and panelist for numerous programs, presentations, and seminars relating to domestic violence.

Jones described a "Power and Control Wheel," which illustrates various tactics an abuser can utilize to maintain control over the victim, including intimidation, emotional abuse, use of isolation, minimizing and denying things that the victim brings up, threatening to take children away, use of coercion and threats, and acting entitled.  Jones testified that these tactics can cause a victim to stay in a relationship even when outsiders may wonder why the victim has not left her abuser.  Jones also stated that many victims of domestic violence attempt to keep family and friends from finding out about the abuse because they believe that the abuse is their fault, or feel embarrassed or ashamed, especially in regards to sexual abuse.

### d.   Pliego's demeanor and propensity for violence

Defne Dursunkaya, M.D., was Pliego's psychiatrist in Turkey, and she prescribed him medication for adjustment disorder with anxiety and depression.  Dursunkaya testified that Pliego had no violent outbursts in their sessions and that in her expert opinion, he was not prone to violence and was not a violent person.  Hayes elicited testimony and produced multiple e-mails between Pliego and his doctor, showing that Pliego had assisted Dr. Dursunkaya's daughter in getting an appointment at the consulate to secure her Visa more quickly.

Colonel Eduardo Luis Fernandez Martin testified via deposition.  He is the Counsellor for Home Affairs at the Spanish Embassy in Ankara.  Martin testified that he saw Pliego three to four times per week at work, starting in July of 2012.  He saw Pliego, Hayes, and the child together on three occasions: a work luncheon, a Christmas dinner, and a Thanksgiving dinner.  Martin testified that both parents interacted with the child, and that he did not notice any threatening or abnormal behavior.

Yusuf Bozkurt testified via deposition.  Bozkurt is the building officer employed at the building where Pliego and Hayes lived with the child in Ankara, Turkey.  He is the building's general handyman, and he resides in the basement.  Bozkurt testified to seeing Pliego two to three times per day, and saw him with the child multiple times.  He frequently saw Pliego or Hayes taking the child to the park.  He never witnessed any abuse or anything abnormal, and said that the child appeared happy.  Finally, Bozkurt testified that he never saw Pliego angry or intoxicated, and that he never received a call or complaint about noise coming from the family's apartment.

### e.   Domestic violence in Turkey[11]

Eray Karinca testified via deposition.  Karinca is an attorney in Turkey, and was a Judge for 26 years on a Turkish family court and a criminal court.  He has various honors and several publications regarding his work on domestic violence; he also assisted in writing a Turkish law intended to protect families and children from abuse.  Karinca testified as to the existence of a variety of remedies available to victims of domestic violence or child abuse in Turkey.  For example, when an aggrieved woman applies to the administrative chief pursuant to rule 6284, "several measures may be taken such as providing her with housing, legal and psychological counseling and financial assistance."  Karinca noted that as a judge, he gave many rulings protecting women and children from domestic violence and also saw the police implement and enforce domestic violence laws.  Karinca noted that diplomatic spouses can get temporary orders of protection.

---

[11] Maria Iceta Hernandez also testified via deposition. She is a family law attorney in Spain, and testified discussing Spanish custody law.  Because, as discussed below, the Court determines that the habitual residence is Turkey, her testimony is irrelevant for our purposes.

During his deposition, Karinca said violence against women and children is not acceptable in Ankara.  However, in his expert report, Karinca stated that Ankara has five million residents and "different social layers like all metropolises.  Even though violence and harassment against women and children are specifically considered legitimate in some social layers, generally it is not acceptable to the majority of the society."

## CONCLUSIONS OF LAW

This litigation arises under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610 (2012).  ICARA codifies the Hague Convention on the Civil Aspects of International Child Abduction. The Hague Convention was adopted by the signatory nations[12] "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting the Hague Abduction Convention preamble). "[T]he Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063–64 (6th Cir. 1996) ("*Friedrich II*") (internal citations omitted).

"When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir.1993) ("*Friedrich I*") (citations omitted); *see also Friedrich II*, 78 F.3d at 1065 (noting that the merits of custody dispute are "forbidden territory" for a court adjudicating a Hague Convention petition for return of child).  Further, courts are directed to employ "the most expeditious procedures available" to adjudicate a petition seeking the return of a child under the

---

[12] Spain, Turkey, and the United States are all signatory nations.

Hague Convention and ICARA. *March v. Levine*, 249 F.3d 462, 474–75 (6th Cir. 2001) (holding that there is no requirement under the Hague Convention or ICARA that discovery be allowed or that an evidentiary hearing be conducted; "fast track" proceedings are required).

### 1. The prima facie case

To establish a prima facie case for the return of a child, the petitioner must demonstrate by a preponderance of the evidence that: (1) the child had a "habitual residence" in a foreign country that is a signatory to the Convention; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of the child's wrongful removal or retention.  22 U.S.C. § 9003; *McKie v. Jude*, 2011 WL 53058, at *5 (E.D. Ky. Jan. 7, 2011) (citations omitted).

Once the petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent who may assert certain affirmative defenses.  *Id.*  There are several affirmative defenses set out in the Convention, which must be narrowly construed.  First, the child should not be returned if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (quoting 42 U.S.C. § 11603(e)(2)(A)).  Further, the child should not be returned if return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *Friedrich II*, 78 F.3d at 1067; Hague Convention, Article 20.  The respondent must prove these defenses by clear and convincing evidence. *Jensie v. Jensie*, 2012 WL 5178168, at *1 (E.D. Ky. Oct. 18, 2012).  Finally, a court may refuse to order the child's return if the parent seeking return consented or acquiesced to the removal or retention of the child.  *Friedrich II*, 78 F.3d at 1067. The respondent must prove this defense by a preponderance of the evidence.  *Id.*

18

Pliego filed this claim pursuant to ICARA on August 25, 2014.  He argues that: the child's habitual residence was Spain, or in the alternative, Turkey; that the child's removal by Hayes was in breach of his custody rights under the laws of either Spain or Turkey; and that he was exercising those custody rights when the child was wrongfully removed.  Hayes responds that the child's habitual residence is the United States, or in the alternative, that the child does not have a habitual residence.  Further, she argues that Pliego does not have custody rights under Turkish law, and that several affirmative defenses apply.  The Court held an evidentiary hearing on December 18 and 19, 2014.

### a. Habitual Residence

In order to bring a claim under ICARA, Pliego must first prove that the child had a "habitual residence" in a foreign country that is a signatory to the Convention.  Thus, the Court must determine which country is the child's habitual residence.  In making this determination, the Convention instructs courts to consider a child's experience prior to the alleged breach of custody rights to determine where he was a habitual resident with the consent of both parents. The Sixth Circuit has held that a child can have only one habitual residence.  *Friedrich I*, 983 F.2d at 1401.  "On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward."  *Id.*  "Habitual residence is not the same as the concept of domicile and neither one's nationality nor one's intent to return [to another country] play a role in determining one's habitual residence."  *Fridlund v. Spychaj–Fridlund*, 654 F. Supp. 2d 634, 637 (E.D. Ky. 2009) (citing *Friedrich I*, 983 F.2d at 1401). Essentially, the Court is tasked with determining "whether a child has made a country [his] home before the date of [his] removal or retention."  *Karkkainen*, 445 F.3d at 292; *see also Jenkins,* 569 F.3d at 553 (stating that the time period immediately preceding wrongful retention determines

habitual residence).  Factors that may guide a court in making this determination include whether and to what degree the child engages in academic activities, social engagements, and participation in sports programs and excursions in the country, as well as the location of the child's belongings and connections with people and places.  *Jenkins v. Jenkins*, 569 F. 3d 549, 556 (6th Cir. 2008).

Finally, some circuits consider the "shared parental intent" doctrine; in other words, they consider the subjective intent of the parents in determining the habitual residence of the child. Pliego argued that the unique facts of this case warrant consideration of this doctrine, so the Court will discuss it briefly.  In *Robert v. Tesson*, 507 F. 3d 981 (6th Cir. 2007), the Sixth Circuit rejected use of parental intent as a factor.  The court reversed a district court that considered the parents' intent regarding their child's residence, noting that "the court below should have focused solely on the past experiences of the child, not the intentions of the parents."  *Id.* at 991 (stating that the shared intent rule "turns the Hague Convention on its head" and is clearly contrary to Sixth Circuit precedent).  Rather, the court held that a child's habitual residence for the purposes of the Convention is the nation where, at the time of removal, the child has been present long enough to allow acclimatization, and where this presence has a degree of settled purpose from the child's perspective.  *Id.* at 992-93.

i.   Analysis

Pliego argues that the unique facts of this case render application of the shared parental intent doctrine appropriate, and that applying that doctrine would make the child's habitual residence Spain.  Alternatively, Pliego argues that the child established a habitual residence in Turkey under the *Robert v. Tesson* analysis.  Hayes argues that the child did not have his habitual residence in either Spain or Turkey.

## 1. Spain

First, Pliego argues that the standards articulated in *Robert* have not been applied in a factual situation such as this one, and that use of the parental intent standard would be more appropriate. Pliego notes that as a diplomat, he is routinely stationed in different countries, some of which could potentially be not signatories to the Hague Convention. Pliego argues that were he to be assigned to be a diplomat in Iraq, for example, before the child had been wrongfully removed to the United States, he would not be entitled to relief under the *Robert* analysis.

Pliego is correct in noting that the facts of this case make the determination of habitual residence a unique and somewhat complicated inquiry. The child has lived in two countries, Indonesia and Turkey, and taken extended visits to two others, Spain and the United States. The child is a dual citizen of the United States and Spain, and speaks both languages.[13] The child does not speak Turkish. Because he is the child of a diplomat, the child, along with his parents, has not been a citizen of the countries where he has resided.

Further, Pliego's hypothetical situation where he is assigned to a country that is not a Hague Convention signatory is persuasive. However, Pliego testified that he and Hayes both exercised considerable control in choosing the countries where he would be posted. Selecting a country that is not a signatory to the Hague Convention, such as Iraq, would be a risk that Pliego would voluntarily assume. Regardless, while Pliego's argument is creative, this Court is bound by Sixth Circuit precedent soundly rejecting the parental intent doctrine. *See Robert*, 507 F. 3d 981 (6th Cir. 2007) (holding that the district court should have focused solely on the past experiences of the child, not the intentions of the parents, in determining habitual residence). The Court must examine where, at the time of removal, the child was present long enough to allow acclimatization, and where this presence has a degree of settled purpose from the child's

---

[13] Pliego testified that since moving to the United States, the child has lost some of his Spanish language abilities.

perspective.  *Id.*  Thus, the Court holds that the child did not establish a habitual residence in Spain.

### 2.  United States

Hayes argues that the child's habitual residence is the United States.  She presented evidence that the child has been living happily in Kentucky since April of 2014 and is very well cared for.  Additionally, he is attending school and playing on a soccer team.  However, the Sixth Circuit has made it clear that the Court cannot consider the child's residence or other factors after the wrongful removal.  *See Robert*, 507 F. 3d at 992-93.  Further, despite being born in Kentucky and possessing American citizenship, the child was only present in the United States for approximately three months total before his removal from Turkey.  Thus, the United States is not the child's habitual residence.

### 3.  Turkey

Alternatively, Pliego argues that the child has established a habitual residence in Turkey, pointing to the child's schedule of activities while living there.  In response, Hayes argues that "the child has no cultural, social, or linguistic connection to Turkey," and that "it is unlikely he is acclimatized to any particular place given his frequent travel and relocations."  Further, Hayes argues that returning the child to Turkey "would cause the very harm the Convention is supposed to prevent" because he would lose contact with the parent who has been in charge of his upbringing, and would suffer "the uncertainty and frustration which comes from the necessity to adapt to a strange language, unfamiliar cultural conditions, and unknown teachers and relatives."

A variety of factors are relevant to this inquiry.  First and most importantly, the travel logs show that up until the time of his removal, the child lived in Turkey consistently for

approximately 21 months.[14]  At the time of his removal, the child was approximately 36 months old.  All of his belongings were in his room in Turkey.  Further, the child attended a playgroup, "Yapa," one or two times per week.  Later, the child attended a preschool, Ankara English Preschool, between three and five mornings per week.  The child frequently played in the park across the street.  He attended playgroups with friends as well as weekly services at the Anglican Church.

Having a diplomat as a parent makes the child's situation somewhat unique: the child did not begin to learn Turkish, as his parents did not intend for him to stay there longer than Pliego's assignment in the country.  Further, he was not a Turkish citizen, nor was he to apply for Turkish citizenship.  However, the child moved to Turkey and remained there for nearly two years with the exception of travel and vacation.  In determining habitual residence, the Court must "look backward in time."  *Friedrich I*, 983 F.2d at 1401.  This this case is, in some ways, a simple one despite the unique circumstances: the child lived consistently in Turkey for the majority of the last two years of his short life.  Looking at the factors articulated in *Jenkins*, the child engaged in social and academic activities in Turkey, as much as would reasonably be possible for a child of his age.  *See* 569 F. 3d at 556.  Further, his belongings were all in his room in Turkey.  *See id.*  The child spent nearly two-thirds of his life before removal in Turkey; accordingly, the Court finds that his presence there had a "degree of settled purpose."  *See Robert*, 507 F. 3d at 992-93.  Thus, the Court holds that the child's habitual residence is Turkey, and that Pliego has satisfied this element of his prima facie case.

      b.  <u>Custody rights of petitioner</u>

---

[14] This includes two months when the child was visiting Kentucky and two weeks when the child was vacationing in Spain.

Next, petitioner must establish that the removal of the child was in breach of the petitioner's custody rights under the law of the country of habitual residence, and that the petitioner was exercising those rights at the time of the child's wrongful removal or retention.

Custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." *Friedrich II*, 78 F. 3d at 1064. "[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Freidrich II*, 78 F.3d at 1066. "Once it is determined that a party had valid custody rights under the country of origin's laws, '[v]ery little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child.'" *In re Application of Adan*, 437 F.3d 381, 391 (3d Cir. 2006) (quoting Text and Legal Analysis, 51 Fed.Reg. 10,494, 10,507 (Mar. 26, 1986) (hereinafter "Hague Convention Analysis")). Further, once a court determines that the parent exercised custody rights "in any manner," it should stop its inquiry, "completely avoiding the question whether the parent exercised the custody rights well or badly," as this inquiry would go to the merits of the custody dispute and would thus be outside the jurisdiction of the federal courts. *Friedrich II*, 78 F.3d at 1066.

### i.    *Pliego's custody rights*

Here, Pliego argues that Hayes's retention of the child in Kentucky was in violation of Pliego's custody rights that he was exercising, under either Spanish or Turkish law. Because the court has determined that the child's habitual residence was Turkey, it will examine Turkish law

to determine whether Pliego had and was exercising custody over the child. Hayes argues that Turkey has no jurisdiction over Pliego and that he "is legally precluded from asserting any right of custody under Turkish law." Further, Hayes argues that because of Pliego's diplomatic status, she would be unable to serve him with court documents to secure a custody determination in Turkey.

Article 335 of the Turkish Civil Code regulates the general provisions of child custody in the country. Under the first paragraph of Article 335, "every minor child is under parental custody of his/her mother and father. Parental custody may not be removed from mother and father without a legal cause." There is no contention that Pliego is not the father of the child. As the father, he currently has custody of the child. Further, it is clear from the evidence presented that he was exercising his custody rights. The Court is not to determine, at this point, whether those rights were exercised "well or badly," as this would go to the merits of the custody dispute. *See Freidrich II*, 78 F.3d at 1066. Because the Court has determined that Pliego had custody rights and was exercising them at the time of removal, it holds that he has satisfied his prima facie case under ICARA.

The burden now shifts to Hayes to present her affirmative defenses.

**2. Affirmative defenses**

a. <u>Consent</u>

Hayes originally argued that Pliego consented to the child's staying in Kentucky. Acquiescence or consent to removal of the child "requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Freidrich II*, 78 F.3d at 1070. The *Freidrich II* court held that consent requires "an act or statement with the requisite formality,

such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Id.* While Hayes originally raised a consent defense, she admitted during her testimony that Pliego ceased to consent to the child remaining in the United States. Thus, she has not shown by a preponderance of the evidence that Pliego consented or acquiesced to the child remaining in Kentucky.

b. Intolerable situation

Article 13 of the Convention provides a defense where it is shown that return would place the child in an "intolerable situation." 42 U.S.C. § 11603(e)(2)(A)). An "intolerable situation" requires the Court to conduct a "robust evaluation of the people and circumstances awaiting in the child's habitual residence," and must constitute "more than a cursory evaluation of the [home country's] civil stability." *See Mendez Lynch*, 220 F. Supp. 2d 1347, 1364 (M.D. Fla. 2002); *In re D.D.*, 440 F. Supp. 2d 1283, 1299 (M.D. Fla. 2006). In *Mendez Lynch*, the court noted that although there was great economic and governmental turmoil in Argentina, the country would still be tolerable for the child. 220 F. Supp. 2d at 1364.

Here, Hayes did not provide evidence that the political climate, judicial system, or conditions in Turkey would place the child in an "intolerable situation." Thus, she has not satisfied her burden under this affirmative defense.

c. Grave risk of harm

Hayes argues that the child would be in grave risk of harm if returned to Turkey. A child should not be returned to his or her habitual residence if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (quoting 42 U.S.C. § 11603(e)(2)(A)). The respondent must prove this defense by clear and convincing evidence.

26

*Jensie* , 2012 WL 5178168, at *1.  Hayes argues that she has satisfied her burden of proving that returning the child to Turkey would cause a "grave risk of harm" by presenting evidence of abuse.  Further, she notes the following:

> A typical pattern [in ICARA cases] involves a female U.S. national who has married a male foreign national and moved with her spouse to a foreign country. In most Hague cases invoking grave risk on the basis of domestic violence, the abuse begins before the transnational move. Ultimately, the victim flees with her children back to the United States in order to escape the abuse. The batterer, left behind in the country of habitual residence, then files a petition under the Hague Convention requesting return of the children to adjudicate the custody issues. *Van De Sande v. Van De Sande*, 431 F.3d 567, 568 (7th Cir. 2005) (citing Roxanne Hoegger, "What If She Leaves? Domestic Violence Cases Under the Hague Convention and the Insufficiency of the Undertakings Remedy," 18 **Berkeley Women's L.J.** 181, 187 (2003).  It thus makes sense that 'the Convention's purposes [would] not . . . be furthered by forcing the return of children who were the direct or indirect victims of domestic violence.'" *Simcox v. Simcox*, 511 F.3d 594, 604-605 (6th Cir. 2007) (citing Merle H. Weiner, Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 33 **Colum. Human Rights L. Rev.** 275, 352-53 (2002)).

Docket No. 69.

Pliego argues that the evidence does not establish that the child faces a grave risk of harm if he is returned to Turkey.  Pliego argues that the allegations of abuse are unsupported and contradicted by the evidence.  He notes the lack of testimony from those who saw bruising on Hayes or the child, reports filed with authorities or police, or photographic evidence, aside from several photographs showing light, minor bruising.  Even assuming the truth of Hayes's allegations, Pliego argues that the allegations do not rise to the level of grave harm to the child.

"The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule." *Simcox*, 511 F.3d at 604 (internal citation omitted).  "The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence."  *Freidrich II*, 78 F.3d at 1068 (6th Cir. 1996). The Court also stated:

> Only evidence directly establishing the existence of a grave risk that would
> expose the child to physical or emotional harm or otherwise place the child in an
> intolerable situation is material to the court's determination. The person opposing
> the child's return must show that the risk to the child is grave, not merely serious.

*Id*.  In considering the risk, the Court should focus on the time period between repatriation and

the determination of custody by the courts in the child's homeland.  *Simcox*, 511 F.3d at 607.

The Sixth Circuit has delineated three broad categories of abusive situations.  First, in

cases where the abuse is "relatively minor," the Court noted that it is unlikely that the risk of

harm to the child will rise to the level of a "grave" risk.  *Id*.  "Second, at the other end of the

spectrum, there are cases in which the risk of harm is clearly grave, such as where there is

credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death

threats, or serious neglect."  *Id*. at 607–08.  Third, there are cases that fall somewhere in the

middle, "where the abuse is substantially more than minor, but is less than obviously

intolerable."  *Id*. at 608.  In these cases, a court must conduct a "fact-intensive inquiry that

depends on careful consideration of several factors, including the nature and frequency of the

abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that

would sufficiently ameliorate the risk of harm to the child caused by its return."  *Id*. at 607-09.

In *Simcox*, "[t]he nature of abuse . . .  was both physical (repeated beatings, hair pulling,

ear pulling, and belt-whipping) and psychological ([the father's] profane outbursts and abuse of

the children's mother in their presence)."  *Id.* at 608-09.  The incidents were not isolated or

sporadic, and a psychologist who examined the children found them to be suffering from post-

traumatic stress disorder ("PTSD").  *Id*.  Even so, the Sixth Circuit found the case to fit into the

middle category; it first noted that the allegations were less serious than allegations in other cases

finding grave risk.  *See, e.g., Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005)

(finding grave risk where the father had beaten and choked his wife severely several times a

week in front of the children, physically abused his children, and threatened to kill his wife and children); *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000) (finding grave risk based on the husband's frequent violent beatings of his wife and child's diagnosis with PTSD; doctor testified as to seeing bruises on multiples occasions and photographs corroborated testimony); *Elyashiv v. Elyashiv*, 353 F.Supp.2d 394, 398-400 (E.D.N.Y. 2005) (finding grave risk where father beat the children once or twice a week, threatened to kill his son and wife with weapons he kept in the house, and severely abused children's mother in their presence; children were diagnosed with PTSD and suicidal thoughts); *Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456, 459-60 (D. Md. 1999) (finding grave risk where child had been whipped with belts, punched, and kicked, the father threatened to kill the children and kept a loaded gun, and the child's mother had been subjected to more serious attacks, including choking and a broken nose).

Ultimately, the court in *Simcox* held that the "serious nature of the abuse, the extreme frequency with which it occurred, and the reasonable likelihood that it will occur again absent sufficient protection" rose to the level of a grave risk of harm.  511 F.3d at 609.

In *Jensie v. Jensie*, the parties presented evidence of an incident of domestic violence: "[The father] testified that [the mother] became upset and punched him several times in the groin, while he was holding [the child]. [The mother's] testimony was that [the father] pushed her and squeezed her breast, which prompted her to punch him in the groin."  2012 WL 5178168, at *3 (E.D. Ky. Oct. 18, 2012).  The court held that this incident was isolated, stating that there was no evidence of a pattern, and that the mother "never called the police and never reported any abuse to the authorities."  *Id.*  It held that she had not satisfied the "grave risk" defense, noting that the facts "stand[] in stark contrast to that which the Sixth Circuit found sufficient in *Simcox* to satisfy the "grave risk" defense."  *Id.*

29

Several other cases have similarly held that a certain level of abuse does not constitute a grave risk. *See e.g. McManus v. McManus*, 354 F. Supp. 2d 62, 69-70 (D. Mass. 2005) (holding that "two incidents" of a mother striking two of her four children and a generally chaotic home environment was insufficient to establish a grave risk of harm because it did not show "a sustained pattern of physical abuse"); *Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (stating that a husband's "verbal abuse and an incident of physical shoving" directed at his wife did not establish a grave risk to the child, especially where there was no allegation that the father had abused the child  physically or psychologically); *Tabacchi v. Harrison*, 2000 WL 190576 (N.D. Ill. Feb. 10, 2000) (not finding grave risk where the wife offered evidence of her husband's history of repeated physical and verbal abuse, including violent arguments, throwing items, hitting and slapping her on the head, grabbing her and throwing her to the ground, and choking her and her PTSD resulting from these incidents; noting that while the husband's behavior toward his wife is unacceptable, the risk must be to the child).

Finally, in *Mauvais v. Herisse*, 772 F. 3d 6 (1st Cir. 2014), the mother alleged that she was raped and abused by her husband.  The court stated that, "the mother's allegations of abuse are not to be taken lightly. She has described incidents of brutality that, if true, paint a disturbing portrait of a physically, sexually, and emotionally abusive and controlling husband;" however the court did not fully credit the mother's testimony in part because "father denies the mother's allegations, and the mother has offered scant evidence to corroborate her testimony."  *Id.* at 18. The court noted that the mother did not seek legal protection or make allegations before wrongfully removing the child from the country.  *Id.*  Ultimately, the First Circuit affirmed the district court's decision that the mother did not bear her burden of proof in establishing a grave risk, noting that the case involved "competing 'he said, she said' testimony from both parties,

with little independent evidence corroborating the mother's testimony, and no clear acceptance by the district court of the mother's narrative over the father's." *Id.* at 19; *see also Avendano v. Smith,* 806 F. Supp. 2d 1149 (D.N.M. 2011) (admitting that there was evidence that the father raped and abused the mother, but noting that these were isolated incidents not aimed at the children).

### i.   Allegations of abuse

The parties paint vastly different pictures of their marriage.  Hayes alleged that Pliego abused both her and the child, which Pliego denies.  While some allegations and stories are corroborated with other evidence or by other witnesses, largely the allegations come down to the differing testimony of Pliego and Hayes.  Generally, the Court found both Pliego and Hayes to be credible witnesses, leading the Court to believe that the truth lies somewhere in the middle.

### 1.  Abuse of the child

The Court will first discuss the alleged abuse of the child.  Hayes alleged that Pliego grabbed the child by the back of the neck, leaving bruises.  Hayes submitted photographs to the Court, which appear to show light bruising on the back of the child's neck and on the back of his legs; they do not show how he received the bruises.  Hayes alleged that Pliego would force-feed the child.  Further, she described two incidents that she found concerning: first, she alleged that Pliego left the child kicking and screaming at the top of the stairs near the space in the railing where he could have fallen.  Second, Hayes described an incident where she and her mother heard the child screaming through an open door.  They looked across the street and saw the child standing alone in the park, with Pliego standing far away.  Hayes's mother's testimony corroborated this story.  Pliego testified that the child was crying because he was used to being carried through the park; Pliego disputed how far away he was from the child.

31

Many of the allegations of abuse appear to relate to Pliego's parenting methods and contributions.  For example, Pliego's alleged distaste for feeding the child in the middle of the night is not relevant to our determination here.  Additionally, Hayes described in detail Pliego's behavior in "force-feeding" the child.  Pliego and his mother, Viyuela, both contested this description.  Without corroboration, the Court is unable to conclude that this behavior occurred, that it may occur again, or even that it necessarily constitutes abuse.  Hayes did not present evidence regarding the effect of the alleged abuse on the child.  *See Walsh*, 221 F.3d at 211 (noting the child's PTSD diagnosis); *Elyashiv*, 353 F. Supp. 2d at 398-400 (same).  Compared to the magnitude of those situations where courts found a grave risk of harm existed, these allegations do not satisfy Hayes's burden.  *See e.g., Elyashiv*, 353 F.Supp.2d at 398-400 (finding grave risk where father beat the children once or twice a week, threatened to kill his son and wife with weapons he kept in the house; children were diagnosed with PTSD and suicidal thoughts); *Rodriguez*, 33 F. Supp. 2d at 459-60 (finding grave risk where child had been whipped with belts, punched, and kicked, where the father threatened to kill the children and kept a loaded gun).

### 2.  *Abuse of Hayes*

Hayes also testified that Pliego abused her.  She described a marriage that involved fighting, yelling, and heated arguments.  Both parties discussed an incident that occurred in Indonesia in approximately September of 2011, while Hayes was six-months pregnant.  According to Hayes's testimony, she threatened to jump off the balcony in order to get Pliego to back away while he was in a rage; afterwards, Pliego roughly grabbed her shoulder, leaving bruises, and threatened to "punch her in the face."  Pliego described the event differently,

testifying that he believed Hayes intended to jump off of the balcony, and that he grabbed her to prevent Hayes from jumping.

Further, Hayes testified that Pliego twice pushed her in the foyer of the Indonesian apartment while she was holding the child; the second time, she fell after being pushed.  Hayes testified that the majority of the abuse occurred in front of the child.  Further, Hayes testified that Pliego took her and the child's passports out of the house and said that he would "throw her out in the street like the dog you are," and that "if you ever mention leaving me with [the child] again, I'll kill you in your sleep."  These incidents, with a few exceptions noted above and in the factual findings, were not corroborated by other evidence.  While it is certainly not dispositive of the truth of her allegations, the Court notes that Hayes did not report the abuse to the authorities or present bruises to any medical personnel.[15]  While Hayes's testimony was generally credible, these events, while concerning, are not enough to constitute grave risk to the child.

Finally, Hayes testified that on three occasions in Turkey in 2013 and 2014, Pliego forced her to have anal sex against her will. In his testimony, Pliego vehemently denied having anal sex or any nonconsensual sex with Hayes at any time.  These allegations were not corroborated by other testimony, police reports, or medical reports.   While the Court is sympathetic to the difficulties inherent in proving the occurrence of domestic violence or rape, especially in light of LeTonia Jones's expert testimony, it found both witnesses to be credible. Thus, the Court finds that Hayes has not satisfied her burden of proving by clear and convincing evidence that there will be a grave risk to the child were he to be returned to Turkey.

---

[15] Some courts have considered an alleged victim's failure to report abuse.  *See, e.g., Jensie v. Jensie,* 2012 WL 5178168, at *3 (E.D. Ky. Oct. 18, 2012) (noting that the mother "never called the police and never reported any abuse to the authorities).  The testimony of domestic violence expert LeTonia Jones illuminated the various reasons victims stay with their abusers and can hesitate to report incidents of violence.  Further, the Court notes that Hayes was living in a foreign country where she did not speak the language, and her belief, according to her testimony, that authorities in Turkey would not take her claims seriously.

This case is a difficult one for the Court, as it is guided by case law establishing a high burden for the respondent and a narrow grave risk exception.  Much has been written regarding the difficulty victims of domestic abuse face in litigating ICARA cases.  *See, e.g.,* Taryn Lindhorst & Jeffrey L. Edleson, Battered Women, Their Children, and International Law: the Unintended Consequences of the Hague Child Abduction Convention (2012); Shani M. King, *The Hague Convention and Domestic Violence:  Proposals for Balancing the Policies of Discouraging Child Abduction and Protecting Children from Domestic Violence*, 47 Fam. L.Q. 299 (2013); Merle H. Weiner, *International Child Abduction and the Escape from Domestic Violence*, 69 Fordham L. Rev. 593 (2000).  Compounding this is the inherent difficulty of attempting proving rape and domestic abuse allegations in court.  Unfortunately, this leaves the Court in the uncomfortable position of both understanding why there is little proof of these allegations, and still requiring more under the law.

Having determined that the petition should be granted, the Court feels additional comments are necessary.  This finding should not be interpreted that the Court did not find the factual testimony of Hayes and her witnesses credible; the Court does not question the credibility of those witnesses.  In the end, with the high standard required, the evidence simply was insufficient for the Court to find there was a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Further, the law is clear that this Court may only determine the merits of the abduction claim.  The merits of the underlying custody claim are not to be considered.  The issue of custody is different and is yet to be determined.  This opinion granting the petition should not be considered by the court as favoring Pliego on future custody decisions.  The parties may have had different cultural and personal methods of parenting, but at least as to the treatment of the

34

child, the Court does not question that both parties love and intend well for the child.  As to their respective treatment as to each other, Hayes's allegations are more severe than Pliego's.  However, these issues are best left to the court determining custody issues.

## CONCLUSION

For these reasons, and consistent with the Court's conclusions above, IT IS HEREBY ORDERED that:

(1) The Petition for Return of Child pursuant to 42 U.S.C. § 11601 is **GRANTED**.  Respondent is hereby **ORDERED** to deliver timely the child to the Petitioner at a time and place to be determined subsequently so that the child may accompany Petitioner back to Turkey.  If the parties do not agree as to the timing of this transfer, they may petition the court.  If any such petition is filed, petitioner shall immediately notify Kelly Harris by e-mail at Kelly_P_Harris@kywd.uscourts.gov when same is filed.  The Court expects the parties to cooperate on the timing and mechanisms of the transfer;

(2) Prior to that time, it is hereby ORDERED that the child shall not be taken outside of the state of Kentucky;

(3) Petitioner's counsel is hereby given leave to give Petitioner the child's passports;

(4) the Court will rule separately regarding the issue of attorneys' fees; and

(5) A separate judgment shall enter concurrently.